IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* Susan Anthony | § <br> § <br> § | CIVIL ACTION NO. 15 - 2291 |
| STATE OF TEXAS *ex rel.* Susan Anthony | § <br> § <br> § <br> § <br> § <br> § | RELATOR SUSAN ANTHONY'S<br>ORIGINAL COMPLAINT<br>PURSUANT TO 31 U.S.C. §§ 3729<br>3732, FEDERAL FALSE CLAIMS<br>ACT, AND STATE FALSE<br>CLAIMS ACT |
| Plaintiffs, | § <br> § <br> § <br> § | |
| HEALTH SERVICES MANAGEMENT, INC.,<br>and HUNTSVILLE HEALTH CARE CENTER, | § <br> § <br> § <br> § | <u>FILED UNDER SEAL</u> |
| Defendants. | § | <u>JURY TRIAL DEMANDED</u> |

**<u>RELATOR SUSAN ANTHONY'S ORIGINAL COMPLAINT</u>**

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................... 4

II. PARTIES .............................................................................................................. 5

   A. Relator Susan Anthony ................................................................................. 5

   B. The Governmental Plaintiffs ........................................................................ 5

   C. The Defendants ............................................................................................. 5

      1. Health Services Management Inc. ............................................................ 5

      2. Nursing Homes Owned By Health Services Management Inc. .................. 6

III. RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY ........................... 6

IV. JURISDICTION AND VENUE ......................................................................... 6

V. STATUTORY AND REGULATORY FRAMEWORK .......................................... 7

   A. Medicare Part A ........................................................................................... 7

   B. Medicaid ....................................................................................................... 7

   C. The Nursing Home Reform Act and Other Relevant Statutes and Regulations ......... 8

   D. Conditions of Payment in Medicare and Medicaid Programs ..................... 19

   E. Cost Report Certifications ........................................................................... 20

VI. FACTUAL BACKGROUND ............................................................................ 21

   A. Examples of Services Not Performed or Inadequate Care .......................... 27

      1. Patient 3 ................................................................................................ 27

      2. Patient 4 ................................................................................................ 28

      3. Patient 5 ................................................................................................ 30

      4. Patient 6 ................................................................................................ 30

   B. Patients Being Verbally and/or Physically Abused or Neglected ............... 31

   C. Patients Not Being Bathed, Missing Clothes, Not Being Changed ............. 33

   D. Administration's Response .......................................................................... 35

VII. ACTIONABLE CONDUCT OF DEFENDANT UNDER THE FALSE CLAIMS ACT ................................................................................................................. 36

A.    The False Claims Act ................................................................................ 37

B.    Defendants Submitted or Caused to be Submitted False Claims .................. 39

C.    Defendants Made, Used, or Caused to be Made or Used False Records and/or
Statements ................................................................................................ 41

VIII. CAUSES OF ACTION ................................................................................ 44

A.    Count I - False Claims (31 U.S.C. § 3729(a)) ........................................... 44

B.    Count II – False Records or Statements (31 U.S.C. § 3729(a)) ................... 45

RELIEF ................................................................................................................ 46

PRAYER ............................................................................................................... 46

C.    Count III—TEXAS MEDICAID FRAUD PREVENTION ACT ................. 47

IX.    DEMAND FOR JURY TRIAL ................................................................... 50

CERTIFICATE OF SERVICE ............................................................................. 50

1.      Relator Susan Anthony submits this Original Complaint under 31 U.S.C. § 3729-3732 ("False Claims Act") on behalf of the United States of America, under the Texas Medicaid Fraud Prevention Act for Texas, and on her own behalf to recover all damages, penalties, and other remedies established by the False Claims Act and the Texas Medicaid Fraud Prevention Act, and would show the following:

## I.      INTRODUCTION

2.      This case involves a scheme by Huntsville Health Care Center and its parent Health Services Management to bill Medicare and Texas Medicaid for purposes of obtaining payment for services never provided, denying medically necessary services to patients, and acting in such a manner that patients were receiving "worthless services."  Relator Susan Anthony, Director of Marketing for Huntsville Health Care Center, witnessed patient abuse and neglect, including services not performed, inadequate care, physically or verbal abuse, and denial of services, such as food and water provision, on a daily basis.  Ms. Anthony became very concerned that the facility was trying to hide its behavior when she learned that grievance reports that she had written had been removed from the facility's grievance binder before a state survey.  This act along with witnessing several instances of patient neglect that resulted in death or serious bodily injury prompted Ms. Anthony to bring her concerns to management at Huntsville Health Care Center and her superiors at Health Management Services Inc., the owner of Huntsville Health Care Center. Despite knowledge of Ms. Anthony's concerns and a promise to investigate the issues, Huntsville Health Care Center and Health Management Services did nothing to correct the problems, leading Ms. Anthony to bring her allegations and evidence to the government and file this suit in an effort

to shed light on the Defendants' behavior.  Furthermore, the federal and Texas government have suffered damages as a result of the Defendants' sham of providing care to some of the state's neediest and most vulnerable patients.

## II.   PARTIES

### A.   Relator Susan Anthony

3.      Susan Anthony has worked in the healthcare industry for many years.  In 2014, Ms. Anthony began working at Huntsville Health Care Center in Huntsville, Texas.  She was hired to market the center to doctors, hospitals, long term acute hospitals, and similar entities.  As part of her duties, she worked with patient admissions, including discussing the capabilities of the nursing home with patients and/or their families and determining insurance coverage for the patients.

### B.   The Governmental Plaintiffs

4.      The governmental plaintiffs in this lawsuit are the United States of America and the State of Texas.

### C.   The Defendants

#### 1.   Health Services Management Inc.

5.      Health Services Management Inc. is the corporate parent of Huntsville Health Care Center.  In addition to Huntsville Health Care Center, Health Services Management Inc. owns thirteen other nursing homes in Texas:  HSMT – Janisch-Houston, LLC; HSMT Richmond, LLC; HSMT Conroe, LLC; HSMT Friendswood, LLC;  HSMT Huntsville, LLC; HSMT Cleveland, LLC; HSMT Beaumont, LLC; HSMT Lindberg-Baumont, LLC; HSMT Lawrence-Tomball, LLC;

HSMT Sugar Land, LLC; HSMT Liberty LLC; Health Services Management of Texas, LLC; and HSMT Waterton Plaza, LLC.

6.      Health Services Management Inc. is headquartered in Murfreesboro, Tennessee and is owned by the Sweeney family. Health Services Management Inc. may be served through its registered agent at Preston Sweeney, 206 Fortress Boulevard, Murfreesboro, TN 37128-5269.

### 2.  Nursing Homes Owned By Health Services Management Inc.

7.      Huntsville Health Care Center is a nursing home providing services to Medicare and Medicaid patients in Texas.  Huntsville Heath Care Center may be served through Preston Sweeney, 206 Fortress Boulevard, Murfreesboro, TN 37128-5269.

## III.    RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

8.      Any and all acts alleged herein to have been committed by the Defendants were committed by said Defendants' officers, directors, employees, representatives or agents who at all times acted on behalf of the Defendants and within the course and scope of their employment.

9.      The Defendants are related entities sharing common employees, offices and business names such that they are jointly and severally liable under legal theories of respondeat superior.  Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for purposes of this suit, some or all of them can and should be considered as a single entity at law and equity.

## IV.    JURISDICTION AND VENUE

10.     Jurisdiction and venue are proper in this Court pursuant to the False Claims Act (31 U.S.C. § 3732(a)) because Relator seeks remedies on behalf of the United States for multiple

violations of 31 U.S.C. § 3729 in the United States by the Defendants, some of which, upon information and belief, occurred in the Southern District of Texas, and because, based on information and belief, the Defendants transact other business within the Southern District of Texas. All defendants are subject to the general and specific personal jurisdiction of this Court. Jurisdiction is also proper over Relator's state claims under 18 U.S.C. § 3732 and 28 U.S.C. § 1367.

## V.      STATUTORY AND REGULATORY FRAMEWORK

### A.      Medicare Part A

11.      Medicare was established by title XVIII of the Social Security Act of 1965, 42 U.S.C. § 1395 *et seq.* (2000).  It provides federal health insurance for approximately 44 million people who are aged or disabled.  Medicare Part A covers inpatient care in hospitals, skilled nursing facility, hospice, and home health care.  *See* 42 U.S.C. § 1395d (2000).  Under Medicare Part A, skilled nursing facility care is covered only for up to 100 days.  *See id.*  Medicare Part A does not cover long-term or "custodial" care.

### B.      Medicaid

12.      Medicaid was established by title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396 *et seq.* (2000).  It is a joint federal-state program that provides healthcare benefits to over 53 million people who belong to certain groups, particularly the poor and disabled.

13.      Within broad national guidelines established by federal statutes, regulations, and policies, each state: (1) establishes its own eligibility standards; (2) determines the type, amount, duration, and scope of services; (3) sets the rate of payment for services; and (4) administers its

own program. States generally have broad discretion to determine which groups their Medicaid programs will cover and the financial criteria for Medicaid eligibility. To be eligible for federal funds, however, states are required to provide Medicaid coverage for certain individuals who receive federally assisted income-maintenance payments, as well as for related groups who do not receive cash payments. In general, state Medicaid programs are required to cover nursing facility and home health care for eligible individuals age 21 and older. States may receive federal matching funds to provide certain optional services, including prescription drugs.

14.     Because Medicaid is a "payer of last resort," their Medicare coverage is supplemented by services available under their state's Medicaid Program. "Medicaid provides health coverage to more than 4.6 million low-income seniors, nearly all of whom are also enrolled in Medicare." Seniors & Medicare and Medicaid Enrollees, Medicaid.gov, *available at* http://www.medicaid.gov/medicaid-chip-program-information/by-population/medicare-medicaid-enrollees-dual-eligibles/seniors-and-medicare-and-medicaid-enrollees.html (last visited August 6, 2015). Another 3.7 million people with disabilities who are enrolled in Medicare are also covered by Medicaid. *Id.* In total, 8.3 million people are "dual eligible" and enrolled in both Medicaid and Medicare. *Id.*

### C.     The Nursing Home Reform Act and Other Relevant Statutes and Regulations

15.     Statutes and regulations governing the Medicare and Medicaid programs require health care providers, like Defendants, to maintain full compliance with all the rules and regulations governing the programs as a prerequisite to receiving payment under the programs. Moreover providers cannot submit claims for services that are "of a quality which fails to meet professionally recognized standards of health care." 42 U.S.C. § 1320c-5(a)(2) (providers cannot submit Medicare claims for inadequate care); *see also* 42 U.S.C. § 1320A-7b(A)(1)(3) (criminal

penalties for submitting claims when provider knows it has no continued right to receive payment);

42 U.S.C. § 1320a-7(b)(6)(B) (provider can be excluded from participation in Medicare for

submitting claims for inadequate care).

      16.     Congress, in the Omnibus Budget Reconciliation Act of 1987 ("OBRA 87"),

enacted the Nursing Home Reform Act, 42 U.S.C. § 1396r et seq., (hereinafter the "Act") which

took effect on October 1, 1990. A nursing facility is defined in the Act as "an institution . . .

which—

> (1) is primarily engaged in providing to residents—
>
> > (A) skilled nursing care and related services for residents who require
> >     medical or nursing care,
>
> > (B) rehabilitation services for the rehabilitation of injured, disabled, or
> >     sick persons, or
>
> > (C) on a regular basis, health-related care and services to individuals who
> > because of their mental or physical condition require care and services
> > (above the level of room and board) which can be made available to them
> > only through institutional facilities, and is not primarily for the care and
> > treatment of mental diseases; . . . .

42 U.S.C. § 1396r(a).

      17.     The Act mandates that nursing facilities comply with federal requirements relating

to the provision of services. 42 U.S.C. § 1396r(b). Specifically, in terms of the quality of life for

residents of nursing facilities, the Act states that "[a] nursing facility must care for its residents in

such a manner and in such an environment as will promote maintenance or enhancement of the

quality of life of each resident." 42 U.S.C. § 1396r(b)(1)(A).

18.     Additionally, the Act mandates that a nursing facility comply with federal requirements relating to the provision of services.  42 U.S.C. § 1396r(b).  Specifically, the Act states that a nursing facility "must care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident." 42 U.S.C. § 1396r(b)(1)(A).  "A nursing facility must operate and provide service in compliance with all applicable Federal, State and local laws and regulations . . . and with accepted professional standards and principles which apply to professional providing services in such a facility."  42 U.S.C. §§ 1396r(d)(4)(A); 1396r(b)(4)(A)(vii) ("the services provided or arranged by the facility must meet professional standards of quality.").

19.     Moreover the Act requires a nursing facility to "provide services and activities to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident in accordance with a written plan of care which: "describes the medical, nursing, and psychosocial needs of the resident and how such needs will be met . . . ." 42 U.S.C. § 1396r(b)(2)(A). A duty is placed on the nursing facility to fulfill the residents' care plans by providing, or arranging for the provision of, nursing and related services and medically-related social services that attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, pharmaceutical services and dietary services that assure that the meals meet the daily nutritional and special dietary needs of each resident. 42 U.S.C. § 1396r(4)(A)(i-iv).

20.     The Social Security Act mandates that skilled nursing facilities, like Defendants, that participate in the Medicare Program and nursing facilities that participate in Medicaid meet certain specific requirements in order to qualify for participation and receive tax-payer dollars

from these programs.  These requirements are set forth at 42 C.F.R. § 483.1 *et seq.*, and "serve as the basis for survey activities for the purpose of determining whether a facility meets the requirements for participation in Medicare and Medicaid." 42 C.F.R. § 483.1.

21.     Federal law requires that het care provided by nursing homes be of a "quality which meets professionally recognized standard[s] of care." 42 U.S.C. § 1320c-5(a)(2).

22.     Section 483.10 of Title 42 of the Code of Federal Regulations requires states and long term care facilities[1] to abide by a code of residents' rights in order to qualify for Medicare and Medicaid reimbursement.  This code includes rights relating to personal funds held by a nursing home facility.  42 C.F.R. § 483.10(b)(1-8).  The code of residents' rights also prohibits a nursing facility from charging residents for routine hygiene items and services, which are covered by Medicare.  42 C.F.R. § 483.10(b)(8).

> (8) Limitation on charges to personal funds. The facility **may not impose a charge against the personal funds of a resident for any item or service for which payment is made under Medicaid or Medicare** (except for applicable deductible and coinsurance amounts). …
>
> > (i) **Services included in Medicare or Medicaid payment**. During the course of a covered Medicare or Medicaid stay, facilities may not charge a resident for the following categories of items and services:
> >
> > (A) Nursing services as required at Sec. 483.30 of this subpart.
> >
> > (B) Dietary services as required at Sec. 483.35 of this subpart.
> >
> > (C) An activities program as required at Sec. 483.15(f) of this subpart.
> >
> > (D) Room/bed maintenance services.

---

[1]     "Facility" is defined in 42 CFR § 483.5 to include skilled nursing facilities (SNF's) and nursing facilities (NF's).

(E) **Routine personal hygiene items and services** as required to meet the needs of residents, including, but not limited to, **hair hygiene supplies, comb, brush, bath soap, disinfecting soaps** or specialized cleansing agents when indicated to treat special skin problems or to fight infection, **razor, shaving cream, toothbrush, toothpaste, denture adhesive, denture cleaner, dental floss, moisturizing lotion, tissues, cotton balls, cotton swabs, deodorant, incontinence care and supplies, sanitary napkins and related supplies, towels, washcloths, hospital gowns, over the counter drugs, hair and nail hygiene services, bathing, and basic personal laundry.**

42 CFR § 483.10 (emphasis added).

   23.   In addition, section 483.25 of the same title requires that states and long term facilities maintain a quality of care for residents with regard to daily living: "Each resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, in accordance with the comprehensive assessment and plan of care." Section 483.25 also provides quality of care guidance as to several areas of concern regarding the care of the elderly:

> (a) **Activities of daily living**. Based on the comprehensive assessment of a resident, the facility must ensure that--
>> (1)   A resident's abilities in activities of daily living do not diminish unless circumstances of the individual's clinical condition demonstrate that diminution was unavoidable. This includes the resident's ability to--
>>> (i) **Bathe, dress, and groom;**
>>> (ii) Transfer and ambulate;
>>> (iii) **Toilet;**
>>> (iv) **Eat**; and
>>> (v) Use speech, language, or other functional communication systems.
>> (2)   A resident is given the appropriate treatment and services to **maintain or improve his or her abilities** specified in paragraph (a)(1) of this section; and
>> (3)   A resident who is unable to carry out activities of daily living receives the necessary services to maintain **good nutrition, grooming, and personal and oral hygiene.** …
>
> ***
> (h) **Accidents**. The facility must ensure that--

12

> (1) The resident environment remains as free of accident hazards as is possible; and
> (2) Each resident receives **adequate supervision and assistance** devices to prevent accidents.

\*\*\*

(k) **Special needs**. The facility must ensure that residents receive proper treatment and care for the following special services:

> (1) Injections;
> (2) Parenteral and enteral fluids;
> (3) Colostomy, ureterostomy, or ileostomy care;
> (4) **Tracheostomy care;**
> (5) **Tracheal suctioning;**
> (6) **Respiratory care;**

\*\*\*

(m) Medication Errors:  the facility must ensure that—

> (1) It is free of medication error rates of five percent or greater; and
> (2) Residents are free of any significant medication errors.

42 CFR § 483.25 (emphasis added).

24.     Federal regulations also mandate that "[e]ach resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, in accordance with the comprehensive assessment and plan of care." 42 C.F.R. § 483.25. The regulations specifically address the area of nutrition:

> (i) Nutrition. Based on a resident's comprehensive assessment, the facility must ensure that a resident—
>
> > (1)     Maintains acceptable parameters of nutritional status, such as body weight and protein levels, unless the resident's clinical condition demonstrates that this is not possible; and
> > (2)     Receives a therapeutic diet when there is a nutritional problem.

42 C.F.R. § 483.25(i).

25.     Additionally, the federal regulations specifically address those individuals who are tube-fed:

> (g) Naso-gastric tubes. Based on the comprehensive assessment of a resident, the facility must ensure that—

(1) A resident who has been able to eat enough alone or with assistance is not fed by naso-gastric tube unless the resident's clinical condition demonstrates that use of a naso-gastric tube was unavoidable; and

(2) A resident who is fed by a naso-gastric or gastrostomy tube receives the appropriate treatment and services to prevent aspiration pneumonia, diarrhea, vomiting, dehydration, metabolic abnormalities, and nasal-pharyngeal ulcers and to restore, if possible, normal eating skills.

42 C.F.R. § 483.25(g).

26.     Federal regulations address facility practices under 42 C.F.R. § 483.13(c), which requires:

(c) Staff treatment of residents.  The facility must develop and implement written policies and procedures that prohibit mistreatment, neglect, and abuse of residents and misappropriation of resident property.

* * *

(2)   The facility must ensure that **all alleged violations involving mistreatment, neglect, or abuse, including injuries of unknown source, and misappropriation of resident property are reported** immediately to the administrator of the facility and to other officials in accordance with State law through established procedures (including to the State survey and certifications agency).

(3) The facility must have evidence that all alleged violations are thoroughly investigated, and must prevent further potential abuse while the investigation is in progress.

(4) The results of all investigations must be reported to the administrator or his designated representative and other officials in accordance with State law **(including to the State survey and certifications agency) within 5 working days of the incident,** and if the alleged violation is verified appropriate corrective action must be taken.

(emphasis added).

27.     Facilities have a duty to make detailed records involving allegations of misconduct and/or mistreatment by facility staff. 40 Tex. Admin. Code § 19.1923(a). There is a requirement to investigate certain complaints and/or grievances:

14

(b) Accidents, whether or not resulting in injury, and any unusual incidents or abnormal events including allegations of mistreatment of residents by staff or personnel or visitors, must be described in a separate administrative record and reported by the facility in accordance with the licensure Act and this section.

> (1) If the incident appears to be of a serious nature, it must be investigated by or under the direction of the director of nurses, the facility administrator, or a committee charged with this responsibility.

40 TEX. ADMIN. CODE § 19.1923. There is also a requirement that these reports be kept for at least two years. Each report must contain the following information:

> (1) For incidents involving residents, the name of the resident; witnesses, if any; date, time, and description of the incident; circumstances under which it occurred; action taken including documentation of notification of the responsible party and attending physician, if appropriate; and the resident's current (post-incident) health condition, including vital signs and date and time of entry.

> (2) Incident reports describing incidents not involving residents must contain such information as names of individuals involved, date, time, witnesses (if witnesses were present), description of the event or occurrence, including the circumstances under which it occurred, action taken, and final disposition that indicates resolution of the event or occurrence.

40 TEX. ADMIN. CODE § 19.1923(c). While there is not a strict requirement that a record be kept beyond two years, the admin code does state each reported violation must be investigated and there must be evidence of such investigation:

> (2) The facility must ensure that all alleged violations involving mistreatment, neglect, or abuse, including injuries of unknown source, and misappropriation of resident property, are reported immediately to the administrator of the facility and to other officials in accordance with Texas law through established procedures (see § 19.602 of this title (relating to Incidents of Abuse and Neglect Reportable to the Texas Department of Human Services and Law Enforcement Agencies by Facilities)).

> (3) **The facility must have evidence that all alleged violations are thoroughly investigated** and must prevent further potential abuse while the investigation is in progress.

> (4) The results of all investigations must be reported to the administrator or his designated representative and to other officials in accordance with Texas law

(including to the state survey and certification agency) within five workdays of the incident, and if the alleged violation is verified, appropriate corrective action must be taken.

40 TEX. ADMIN. CODE § 19.601 (emphasis added).

28.     Long-term care facilities are also required to provide nursing services that meet the needs of residents. The facility must have sufficient nursing staff to provide nursing and related services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care. Poor patient care is directly tied to inadequate staffing. Skilled Nursing Facilities ("SNFs") and Nursing Facilities ("NFs") must have at least one registered nurse for at least 8 consecutive hours per day, 7 days per week, and either a registered nurse, licensed practical nurse/licensed vocational nurse, and other nursing personnel on duty 24 hours per day, unless a waiver has been granted in accordance with 42 U.S.C. §§ 1395i-3(b)(4)(C), 1396r(b)(4)(C); 42 C.F.R. § 483.30(c) or 42 C.F.R. § 483.30(d).

29.     In addition, each facility in Texas must have sufficient staff to provide nursing and related services to the "highest practicable physical, mental, and psychological well-being of each resident." 40 TEX. ADMIN. CODE § 19.1001 (a). Sufficient staff requires a sufficient number of licensed nurses and other nursing personnel on a 24-hour basis, with a licensed nurse serving as a charge nurse on each shift, and the use of a registered nurse's services for at least 8 consecutive hours a day, seven days a week, and a full time registered nurse serving as a charge nurse. 40 TEX. ADMIN. CODE § 19.1001 (a)(1), (2).

30.     The Nursing Home Reform Act also mandates that "the State shall be responsible for certifying, in accordance with surveys conducted by the state, the compliance of nursing

16

facilities (other than facilities of the State)" . . . "The Secretary of the Department of Health and Human Services ("DHHS") shall be responsible for certifying . . . the compliance of State nursing facilities with the requirements of such subsections." 42 U.S.C. § 1396r(g)(1)(A).

31.     The Centers for Medicare and Medicaid Services ("CMS") is the component of the Federal Government's DHHS that oversees the Medicare and Medicaid programs. A large portion of Medicare and Medicaid dollars is used each year to cover nursing home care and services for the elderly and disabled. The law permits CMS to take a variety of actions against a nursing home for violations. For example, CMS may fine the nursing home, deny payment to the nursing home, assign a temporary manager, or install a state monitor.  When it is considering enforcement action, CMS will consider the extent of harm caused by the deficiencies. If the nursing home does not correct its problems, CMS terminates its agreement with the nursing home.  As a result, the nursing home is no longer certified to provide care to Medicare and Medicaid beneficiaries. Any beneficiaries residing in the home at the time of the termination are transferred to certified facilities. Many times, in order to avoid being decertified by CMS, nursing homes that are in violation of federal or state law will scheme to cover up their violations.

32.     Nursing homes are prohibited from employing any individual as a nurse aide unless that person has completed a training and competency evaluation program and is competent to provide such services. 42 U.S.C. §§ 1395i-3(b)(5), 1396r(b)(5), 1396r(e)(2); 42 C.F.R. §§ 483.75(e), 483.150-483.152. In addition to initial training, nursing homes must offer regular performance reviews and in-service education, including training for individuals providing care to residents with cognitive impairments. States must establish and maintain a registry of all

individuals who have satisfactorily completed nurse aide training and competency evaluation programs.

33.     Further, under Texas law, nurse aides are required to complete a 100 hour basic course with a minimum of sixteen hours of supervised practical training. Prior to any direct contact with residents, trainees are required to have at least sixteen hours of training in a communication and interpersonal skills, infection control, safety and emergency procedures, promoting residents' independence, and respecting residents' rights. 40 TEX. ADMIN. CODE § 94.3. Each trainee is required to pass a competency evaluation which consists of a written or oral examination and a skills demonstration that requires the trainee to demonstrate five randomly selected skills from a skillset generally performed by nurse's aides. 40 TEX. ADMIN. CODE § 94.6.  Additionally, the facility must receive registry verification demonstrating that the nurse aide has met competency evaluation requirements and is not designated in the registry as having a finding concerning abuse, neglect or mistreatment of a resident, or misappropriation of a resident's property. *See* 40 TEX. ADMIN. CODE § 94.3; 40 TEX. ADMIN. CODE § 94.6; 40 TEX. ADMIN. CODE § 94.1; *see also* §19.1903 of the Texas Department of Aging and Disability Services (DADS) *Nursing Facility Requirements for Licensure and Medicaid Certification Handbook.*

34.     Federal regulations define the term "immediate jeopardy" to mean "a situation in which the provider's noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." Federal regulations define the term "neglect" to mean "filature to provide goods and services necessary to avoid physical harm, mental anguish, or mental illness." 42 C.F.R. § 488.301.

35.     When a facility is found to have patients in immediate jeopardy, state survey agencies are authorized, by federal regulations and by the CMS Operations Manual, to impose termination of the facilities' participation as a Medicare or Medicaid provider within two days of the finding of immediate jeopardy or to deny payment to the facility for new admissions of patients (CMS State Operations Manual for Survey and Enforcement Process for Skilled Nursing Facilities and Nursing Facilities Chapter 7 Internet Manuals Only Publication # 100-07 §7301A).

### D.     Conditions of Payment in Medicare and Medicaid Programs

36.     As a condition of receiving payment from Medicare, each provider must submit a Medicare Enrollment application, CMS 855a for institutional providers such as the Defendants, in which the provider agrees to abide by the Medicare laws, regulations and program instructions that apply to the provider and that payment of a claim by Medicare is conditioned upon the claim and underlying transaction complying with the Medicare related laws.

37.     Federal regulations also set forth the requirements for State Fraud and Abuse detection and investigation programs in 42 C.F.R. § 455.1 *et seq*., which require that participants in Medicaid programs receive payments only after certifying the "information [the claim is based on] is true, accurate, and complete," and that the entity "understand[s] that payment of this claim will be from Federal and State funds, and that any falsification, or concealment of a material fact, may be prosecuted under Federal and State laws," upon making of the claim and endorsing of the check.

38.     Furthermore, the Texas application for Medicaid enrollment requires providers to comply with state and federal regulations concerning the care they are providing. Texas codifies its state Medicaid program at Texas Human Resources Code § 32.001 *et seq*.  Regulations

implementing that statute are contained in the Texas Administrative Code.  In addition, in order to provide nursing facility services to Texas Medicaid patients, a nursing facility must submit an application to the Texas Department of Aging and Disability Services, and, if approved, sign a written agreement to participate in Medicaid.  *See* Ex. 40, 2015 Texas Medicaid Provider Enrollment Application; Ex. 26, 2007 Texas Medicaid Provider Enrollment Application.

39.     The Texas Medicaid Provider Agreement provides that (1) the provider must comply with all of the requirements of the Provider Manual and all state and federal laws and amendments governing or regulating Medicaid (Part I.1.1); (2) the provider must certify that claims are submitted in accordance with billing guidelines and procedures promulgated by the Texas Health and Human Services Commission, and that all information in claims data is not only true, accurate, and complete, but can be verified by reference to source documentation maintained by the provider (Part I.1.3.1); and (3) the provider must comply with all laws regulating Medicaid fraud and waste, including keeping and maintaining "all records necessary to fully disclose the extent and medical necessity of services provided by the Provider" and "any information relating to payments claimed by the Provider for furnishing Medicaid services" (Part I.1.2.3). Ex. 26 at 8.1- 8.4.  Additionally, as part of the agreement, a provider certifies that "Provider understands and agrees that any falsification, omission, or misrepresentation in connection with the application for enrollment or with claims filed may result in all paid services declared as an overpayment and subject to recoupment, and may also result in other administrative sanctions that include payment hold, exclusion, debarment, contract cancellation, and monetary penalties." *Id.* at 8.6.

### E.     Cost Report Certifications

40.     Furthermore, Medicare and Medicaid require skilled nursing facilities to submit regular, detailed cost reports accounting for their assets, transactions, and costs.  Skilled nursing facilities use HCFA form 2540-96 or 2540-10 to submit their cost reports.  The forms contain the following certification language:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL, AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT MAY RESULT.
>
> I hereby **certify** that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted **cost report** and the Balance Sheet and Statement of Revenue and Expenses prepared by [provider name and number] for the **cost reporting period** beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further **certify** that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this **cost report** were provided in compliance with such laws and regulations.

41.     Form 2450-96, furthermore, expressly states the consequences of a failure or refusal to certify:

> This report is required by law (42 U.S.C. § 1395g; 42 C.F.R. 413.20(b)).  Failure to report can result in all interim payments made since the beginning of the cost reporting period being deemed overpayments (42U.S.C. § 1395g).

## VI.    FACTUAL BACKGROUND

42.     Ms. Anthony has worked as a marketing manager and then later the Director of Marketing for Huntsville Health Care Center for nearly a year.  Just recently, Ms. Anthony took on the temporary role of business office manager in addition to her role as Director of Marketing. Ms. Anthony was hired to market Huntsville Health Care Center in the medical communities in Texas.  Huntsville Health Care Center is a skilled nursing facility with approximately 82 beds.  It is unique in that it provides specialized services for patients on ventilators, who have had tracheostomies, or who have the need for bedside dialysis.  Only three or four nursing homes in the State of Texas are able to care for these types of patients.  Health Services Management Inc. owns another nursing home in Liberty, Texas that provides these same types of services.  In addition, Health Services Management Inc. has thirteen other nursing homes in Texas:  HSMT – Janisch-Houston, LLC; HSMT Richmond, LLC; HSMT Conroe, LLC; HSMT Friendswood, LLC;  HSMT Huntsville, LLC; HSMT Cleveland, LLC; HSMT Beaumont, LLC; HSMT Lindberg-Baumont, LLC; HSMT Lawrence-Tomball, LLC; HSMT Sugar Land, LLC; HSMT Liberty LLC; Health Services Management of Texas, LLC; and HSMT Waterton Plaza, LLC.

43.     In her marketing position, Ms. Anthony worked closely with patients' families as her duties included preparing patients to be admitted to Huntsville Health Care Center.   Ms. Anthony's office was located inside the nursing facility.  She shared the office with Dominic Franco, an assistant social worker, who also worked on admissions.  As part of her duties, Ms. Anthony would write and file grievances from patients and/or their families when the patients and/or their families had a complaint.  As part of state requirements, Ms. Anthony would file these grievances in the grievance binder.  Mr. Franco was also responsible for writing and filing grievances.  As part of inspection by the Texas Department of Aging and Disabled Services

("DADS"), DADS inspectors would review these grievances.  In addition, corporate policies for Huntsville Health Care Center contained information about patients' rights, including the grievance procedure.  *See* Ex. 27, Health Services Management of Texas Operational Policy Handbook; Ex. 28, Resident Rights and Rights of the Elderly.

44.     In July 2014, Ms. Anthony became concerned that Robert Siekert, the Administrator of the facility, was not properly addressing the grievance reports.  She had several patients and/or their families complaining about patients not being bathed, their clothes not being changed, patients not being taken to the bathroom or their bedside potties not being emptied, bugs inside patient rooms, and worse yet, patients not being properly diagnosed when they had infections, such as urinary tract infections or oral infections, like thrush.  Ms. Anthony reported the complaints to her supervisor, Luke Fannon, Corporate Marketing Consultant for Health Services Management Inc.  Ms. Anthony provided Mr. Fannon with a written report in person at the end of regional marketing meeting on July 18, 2014.  *See* Ex. 1, July 18, 2014 report given to Fannon by Anthony.  Mr. Fannon promised to share this information with Brian Perrine, the Regional Vice President and Operations Manager for Health Services Management Inc.  In her report, Ms. Anthony further explained her concern that in determining whether to admit a patient, the Director of Nursing, Meagan Myers, and Assistant Director of Nursing, Felissa Hamilton, would question how involved the patient's family would be.  Ms. Anthony was told that they did not want to accept patients with "involved families."

45.     On March 11, 2015, DADS came to inspect Huntsville Health Care Center based on complaints from the families of two patients.  Later that day, Mr. Franco called Ms. Anthony; he was upset because Robert Siekert, the Administrator of the facility, and Meagan Myers, the

Director of Nursing, had forced Mr. Franco to alter his original grievance reports regarding these two patients.

46.     One of the patients whose files and information DADS came to inspect was Patient 1. Patient 1's son had filed a complaint with DADS regarding the care of his mother.  On February 26, 2015, Mr. Franco had written his original grievance report: "[Son] stated that [Patient 1] has not moved from her bed since . . . fell (about 2 wks ago).  He requested therapy at least move [patient] in [patient's] bed to minimize the possibility of bed sores."  *See* Ex. 2, 2/26/2015 Grievance Report for Patient 1.  Franco told Ms. Anthony that Meagan Myers did not want investigators to see the original grievance report because it would conflict with documentation and billing records that indicated that Patient 1 had received physical therapy and occupational therapy services during the time period that Patient 1's son reported that his mom had not moved from her bed. *See* Ex. 3, Billing Records for Patient 1.  Mr. Franco left Ms. Anthony a note explaining that:

> "Robert stated this report was 'damning' and when preparing for a state visit by DADS, Meagan and Robert sat down at my desk cross [sic] from me and Meagan reviewed the notes, handed the notes to Robert and said 'fix it' then proceeded to walk out.  Robert then coached me on what to put down and eliminate from the grievance report.  He stated that this would keep the process of looking at notes and clinical procedures form being looked at any further."

*See* Ex. 4, 3/11/2015 Handwritten note from Franco.

47.     The revised grievance report by Mr. Franco stated that "Family member is concerned that she is not participating in therapy since her fall approximately 2 weeks ago."  *See* Ex. 5, Altered 2/26/2015 Grievance Report for Patient 1.  The investigators from DADS only saw the revised grievance report, and determined no basis for the son's complaint existed.  Patient 1

24

died two days later from urinary tract infection sepsis-toxic shock as reported by her son to Lisa Rogers, Business Office Manager, who shared this information with Ms. Anthony via text.

48.    Mr. Franco was also forced to alter his original grievance report for Patient 2.  The original grievance report stated that "Daughter is concerned that [patient] had an infection for 5 days before treatment started."  *See* Ex. 6, 2/24/2015 Grievance Report Patient 2.  Robert Siekert has Mr. Franco change this report to read:  "Daughter is concerned about a possible infection." *See* Ex. 7, Altered 2/24/2015 Grievance Report Patient 2. Again, the investigators from DADS only reviewed the altered grievance record and determined that no basis for the state complaint existed.  Patient 2was later diagnosed with C-Diff, an infection that spread throughout her entire system, and was hospitalized for treatment.

49.    The issue of infections not being properly treated was a frequent complaint by patients and their families.  Many infections were not diagnosed until they reached a critical phase and the patient had to be admitted to an acute care hospital.  The company considered the diagnostic procedures and antibiotics to be an additional expense to it for which it was not reimbursed by Medicare or Medicaid, and therefore did not follow proper procedures for determining if patients had infections or in treating the patients' infections once found.

50.    After learning about Mr. Franco's experience, the next day, March 12, 2015, Ms. Anthony reviewed the grievance binders to determine if any of her reports had been altered.  She discovered that her reports were missing from the binder completely.  Ms. Anthony continued to check the grievance binder over the next few weeks and determined that her reports were being taken out of the binder.  Fortunately, Ms. Anthony kept copies of approximately fifteen reports that she was planning to share with Mr. Fannon and Mr. Perrine.  In addition, Ms. Anthony had in

her possession copies of patient complaints and records for several other patients demonstrating neglect of patients and poor care, as detailed below.

51.    Ms. Anthony discussed her concerns with Siekert. On or around April 8, 2015, a corporate consultant, Jerry Erlander, called Ms. Anthony to investigate her concerns. Patricia Edgell, a corporate nurse for Health Services Management, was also on the phone call. Erlander and Edgell asked for details about the missing grievances so they could look through the binder to see if they could find them.    The next day, Ms. Anthony was instructed by Perrine not to write any more grievances on behalf of patients or families instead only Mr. Franco would be allowed to write grievances. Mr. Franco is identified as a social worker in patients' charts; he has not, however, held a license to practice social work in a nursing facility. To cover up this fact, the facility recently hired a part-time licensed social worker to sign off on Mr. Franco's entries.

52.    In early July 2015, Ms. Anthony observed many of her missing grievance reports lying on Mr. Franco's desk. He appeared to be make additions to the "Documentation of Facility Follow Up" and "Resolution" sections in order to make it appear that the facility investigated and resolved complaints.

53.    Ms. Anthony also learned that the facility's social work department receives bonuses based on the average score received on the Customer Satisfaction Survey, ranging from $300 for an 85% rating to $1,125 for a 94% rating. *See* Ex. 29, 2015 Huntsville Health Care Center Social Work Productivity Incentive Plan. In addition, the department received $500 for survey compliance and another $500 for survey with a standard rating. *Id*. These bonuses were paid on an annual basis. *Id*. Mr. Franco, therefore, had an incentive to bury grievance reports that shed a negative light on the facility.

54.     Ms. Anthony also recently learned that approximately six certified nurse assistants ("CNAs") were terminated after working at the facility for several months.  These individuals had paid for and taken a course at the facility in order to receive their licenses.  Meagan Meyers, however, failed to turn in their paperwork to the state; therefore, the CNAs were performing unlicensed work during their tenure at the facility from approximately February through July 2015.  Thus, Huntsville Health Care Center had been billing for services performed by unlicensed CNAs.

**A.     Examples of Services Not Performed or Inadequate Care**

**1.     Patient 3**

55.     Patient 3, a Medicare/Medicaid patient, was a ventilator/tracheostomy patient.  The problems with this patient started even before her admission.  Jennifer Patterson, the previous Director of Nursing, made it clear the day before admission that she did not want the patient admitted because the daughter was going to be "too involved" in her mother's care.  In fact, on the day of admission, the Director of Nursing instructed a nurse not to admit the patient and to tell the ambulance driver to "turn around and take this patient back to where she came from when she arrives."  Unfortunately for Patient 3, the admission did occur.  On October 13, 2014, two days after Patient 3's admission, Ms. Anthony arrived at work to find the patient's daughter in tears.  Patient 3 was being transported to Huntsville Memorial Hospital, an acute care hospital.  The daughter told Ms. Anthony that when the patient arrived on Saturday, no staff members came to check on her mother for five hours.  She stated that it took more than 30 minutes for someone to respond after the daughter asked for her mom to be changed.  Ms. Anthony wrote this information in a formal grievance report that went missing from the binder.  *See* Ex. 8, 10/13/2014 Grievance Report Patient 3.

56.     After Patient 3 arrived at Huntsville Memorial Hospital, having been transferred for emergency treatment for bleeding form mouth and other orifices, the daughter requested that Ms. Anthony come to the hospital to take another formal grievance report.   Patient 3's daughter stated that her mother's "trach was damaged, dirty and discolored" and had not been suctioned enough. *See* Ex. 9, 10/13/2014 Second Grievance Report Patient 3.  The respiratory therapist at Huntsville Memorial Hospital informed the daughter that if the trach is not suctioned properly, it can become clogged.  *Id*.  The daughter was also concerned that the respiratory therapist at the nursing facility was staying at a hotel where several drug arrests had been made. *Id*. The daughter also complained that the respiratory therapist "will raise the level (re: suctioning) so alarm does not go off at appropriate time."  *Id*.

57.     During the time period of this complaint, a respiratory therapist was arrested while at the nursing facility for utilizing crack cocaine.  The facility is grossly out of compliance with drug screening that is state mandated for all employees having contract with patients.  Ms. Anthony herself has never undergone drug screening at any point in her employment; she is also aware that other staff members have not been tested.   Robert Siekert stated that drug screening is "too expensive" and that the center's budget does not provide for it.

### 2.     Patient 4

58.     Although Patient 4 is a private pay patient on United insurance, her experience demonstrates Huntsville Health Care Center's practice of neglecting its patients and billing for services not rendered.  Patient 4 was on a ventilator and tracheostomy after suffering a severe brain bleed several months ago.  Her parents were very involved in her care.  Her mother is a former Director of Nursing.  On March 16, 2015, Ms. Anthony arrived at work to learn that Patient 4 had

28

sustained a fall resulting in a head injury requiring six to eight staples. Siekert ordered Ms. Anthony to get over to Huntsville Memorial Hospital and "clean up the mess with [Patient 4's] parents." Ms. Anthony went to the hospital and wrote a formal grievance for the family. The family reported that "Rounds not being made4 every 2 hrs. Pt. bed was soaked with urine 3/15/2015 in am. Wet thru the mattress. 3/14/2015 – No ted hose on pat's right arm – no glove-hanging over bed (hand ice cold. Pt req. 2 assist rec'd only 1 – result- pt. fell and sustained head injury. Pt did not receive feeding (12:00 feeding on 3/14/2015. (was discovered but family, no feeding." Ex. 10, 3/16/2015 Grievance Report Patient 4. Of note, the aide who assisted Patient 4 was eight months pregnant. Ms. Anthony helped calm the family and get the patient transferred back to Huntsville Health Care Center as the hospital's Director of Case Management wanted the patient out of the hospital as soon as possible because the family was on the phone talking to an attorney. The family insisted on Patient 4 being transferred to another facility. Ms. Anthony asked Siekert to involve the Medical Director, Dr. Milton Guerrero, to assist in getting the patient transferred back to the nursing temporarily until she could be transferred to a long term acute care hospital. The family agreed to allow Patient 4 to be transferred back to the nursing facility as long as Dr. Guerrero would assist in finding a long-term acute care hospital for their daughter, a staff/family meeting was held, and their daughter was placed in a room close to the nurses' station. Siekert agreed, and Patient 4 was transferred back to the nursing facility.

59.     A meeting was held between Robert Siekert, Dr. Guerrero, Meagan Myers, Dominic Franco, Nicky (physical therapist), Kenya Anderson (medical records), Ms. Anthony, and the family. Ms. Anthony recorded this meeting and has provided the recording to the government. Siekert and Myers were both 25 minutes late to the meeting, and Dr. Guerrero was

30 minutes late.  The family again listed their complaints.  Patient 4 was later admitted to Conroe Regional Medical Center, and it was determined that in addition to the head injury, she had a respiratory infection that had not been diagnosed or treated at Huntsville Health Care Center. Meagan Myers also admonished Ms. Anthony for admitting the patient in the first place "knowing how involved the parents were going to be" and that "you had to know this family was going to cause us a lot of headaches."  Patient 4's mother informed Ms. Anthony that a complaint had been filed with DADS.  The March 16, 2015 Grievance Report is missing from the grievance binder.

60.    After this incident, Dr. Guerrero told Siekert, Myers, and Ms. Anthony that he would no longer accept ventilator/tracheostomy patients.  Siekert found a doctor who will and hired him.

### 3.    Patient 5

61.    Several patients at the facility experienced severe infections.  For example, On May 16, 2015, Patient 5, a tracheostomy patient, was admitted to Conroe Regional Medical Center.  Her nurse noted that Patient 5 had an "extremely bad yeast rash under axilla (both) and pannis and between buttocks cheeks to the point skin peeling off" and had "thrush so thick on tongue there was no pink to be found."  *See* Ex. 30, May 16, 2015 Medical Notes of Patient 5.  In addition, Patient 5's skin was filthy and stunk.  *Id*.  Her tracheostomy (PEG_ tube was filthy to the point of falling apart and clotting.  *Id*.  Progress notes from May 20, 2015 noted that Patient 5's infections were staph infections, including a MRSA infection, and pseudomonas infection.  *Id*.

### 4.    Patient 6

62.    Around the last week of March 2015 or the first part of April 2015, Ms. Anthony learned from co-workers that Huntsville Health Care Center had treated Patient 6 with the wrong

ointment/cream for his leg wound.  His leg became infected and he had to have his leg amputated above the knee at Conroe Regional Medical Center.  After returning to Huntsville Health Care Center, Patient 6 developed two additional serve wounds.

**B.     Patients Being Verbally and/or Physically Abused or Neglected**

63.     Several patients and/or their family members have complained that patients are being poorly treated, verbally abused, and in one instance physically abused.  For example, one November 27, 2014, at least two nurses complained that a verbal altercation between two staff members when a Medicare/Medicaid patient, Patient 7, was having his breathing tubes switched out.  Ex. 12, Grievance Reports Patient 7.  In addition, one nurse stated that a staff member was attempting to "tie down [Patient 7] and restrain" because she did not want to "babysit" him all night.  *Id.*   In another instance, a patient, Patient 8, was called "a dirty fucking nigger" by a CNA, Danielle Brock.  This incident was reported by Monica Eubanks to Mr. Franco and Catherine Richardson, but Ms. Myers successfully had Monica "recant" her report. Patient 8, however, told his daughter about the incident, and his daughter is moving him to another facility.  Ms. Anthony has two audio recordings regarding this incident.[1]  Furthermore, on November 19, 2014, a staff member reported a janitor was rude to a patient attempting to get back to her room.  Ex. 13 Grievance Report Patient 9.

64.     In another instance, the daughter of Patient 10 complained that a CNA, Ms. Ajardney, was "RUDE and ROUGH" with her mom while helping another CNA reposition her mother.  Ex. 31, March 18, 2015 Grievance Report Patient 10's daughter.  She asked that CNA

---

[1] Ms. Anthony provided audiorecordings regarding this incident to the government.

Ajardney not to be allowed to care for her mother ever again. *Id.* This same patient was neglected during her transfer to another facility. On March 27, 2015, the facility discharged and transferred Patient 10, a tracheostomy patient, from Huntsville facility to Copperas Hollow in Caldwell, Texas, an approximately four hour trip and highly dangerous for a tracheostomy patient. There was a problem, however: employees at the facility failed to confirm that Copperas Hollow was expecting the patient. In fact, Copperas Hollow was completely unaware that the patient was being transferred and refused to accept her. Compounding the problem, the Director of Nursing, Meagan Meyers, and Siekert failed to return multiple calls from Copperas Hollow to resolve the issue, resulting in the patient being sent to the emergency room. Someone from the emergency room contacted the Huntsville facility to see if the patient could return to the facility. When the nurse who answered the call, Jessica Rhodes, contacted Meyers, Meyers asked Rhodes to inform the emergency room that "we are sorry, there is nothing we can do right now and that administration staff would be back in the morning." *See* Ex. 33, Huntsville Health Care Center Progress Notes for Patient 10 on 3/27/2015.

65.     The same day, Patient 11 complained that she was told to come out of the shower without being fully dressed and nothing to hold onto or support her, so CNA could help another patient. Ex. 32, 3/18/2015 Grievance Report of Patient 11.

66.     Complaints were also made in November 2014 that nurses and aides were turning off the heat in resident's rooms at night and turning on the air conditioner. Ex. 14 Grievance Report by Vercher. Aides also refused to take patients to the dining room for meals. Ex. 15 Grievance Report by Siekert.

67.     In some instances, patients were not receiving water.  For example, Ms. Anthony believes that Patient 12, a ventilator/tracheostomy and PRN dialysis patient covered by Medicare Part A, missed tube feedings and was deprived water.  Ms. Anthony overheard a nurse talking about how this patient had not urinated for five days.  Shortly thereafter, on or around May 22, 2015, Patient 12 was transferred to Huntsville Memorial Hospital where she was diagnosed with a severe urinary tract infection and sepsis.  The billing form submitted on May 7, 2015 for Patient 12 indicated that she had received over $20,000 in services, including respiratory services, physical and occupational therapy, and routine complex medical treatment, from April 8, 2015 through May 7, 2015.  Ex. 38, 5/7/2015 Bill Submission Patient 12.  Yet, Patient 12 had a severe urinary tract infection and sepsis when admitted to the hospital on or around May 22, 2015.  Patient 12 also had a wound on her sacrum, which became enlarged over a two month period from May to July 2015.  Ex. 39, Medical Records of Patient 12. The advancement of Patient 12's wound occurred at the facility after the hospital had controlled the wound infection.

68.     Another patient, Patient 13, left the facility against medical advice after five days, because she felt she was not receiving the care she need—unable to receive water when requested and denied her medications.

C.      **Patients Not Being Bathed, Missing Clothes, Not Being Changed**

69.     Patients' and family members regularly complained about not receiving hygienic care, not being bathed or shaved, missing clothes, or not being changed.  For example, on November 6, 2014, Patient 14's son reported that it was the sixth time that he was complaining about his father being unshaven.  Ex. 16, Grievance Report Patient 14.  The son of another patient reported that his father had not been shaved for a week.  Ex. 34, Grievance Report Patient 15.  In

33

some instances, patients' clothes were missing, or they were dressed in others' clothes.  Ex. 17, Grievance Report Patient 16; Ex. 18 Grievance Report Patient 17.  During a Resident Council Meeting in February, March and April of 2015, the residents attending the meeting complained about not receiving showers often enough as they receive showers only once or twice a week.  Ex. 35, Feb. 16, 2015 Resident Council Minutes; Ex. 36, Mar. 16, 2015 Resident Council Minutes; Ex. 37, Apr. 21, 2015 Resident Council Minutes.  During the monthly staff meetings in February and March 2015, Meagan Myers, Director of Nursing, reported that patients were not being bathed because the facility could not afford shower techs and the aides refused to bathe patients as the facility is so short-staffed they cannot safely bathe patients alone.  No solution has been identified.

70.     Patients and family members also regularly complained about patients' diapers or bedside potties not being changed or emptied.  For example, Patient 18 complained that after she notified her aide that she needed to be changed, her aide left the building, got in a car and went to lunch without changing her.  Ex. 19, Grievance Report Patient 18.  Another patient, Patient 19, complained that she did not have underwear or depends on overnight.  Her husband stated that he was told by the aides that they never put underwear or depends on patients at night.  Ex. 20, 10/17/2014 Grievance Report Patient 19.  In a second grievance, Patient 19's husband complained again that his wife was naked from waist down and that he was worried about male visitors.  Ex. 24, 10/23/2014 Grievance Report Patient 19.  On March 18, 2015, staff discussed that Patient 20 had not changed since being admitted to the facility, five days earlier, and that the mattress was soaking wet.

71.     Complaints were also received about bugs in patients' rooms.  For example, Patient 21, a minimally responsive patient, died while being transported to a hospital, after her mother

found her unbathed, visibly dirty, and with bugs crawling on her. Prior to her transportation, Patient 21, who could communicate in a limited manner through her trach, complained about being hungry and thirsty.

### D.    Administration's Response

72.    Despite the filing of numerous grievances, the administration at Huntsville Health Care Center continues to ignore or address the complaints.  In fact, on March 23, 2015, Mr. Franco quit after being asked to once again alter records.  In response, Robert Siekert called Ms. Anthony into his office to discuss Mr. Franco's complaints.  She explained that Mr. Franco said he was upset at being asked to alter records and had stated that he was going to contact DADs to report the facility.  Ms. Anthony has an audio recording of this meeting.  Ex. 23, 3/23/2015 Audio recording of meeting between Siekert and Anthony.  During this meeting, Siekert confirmed that he asked Franco to changed grievance records.  Two hours after the meeting, Ms. Anthony received a final warning threatening termination.  Ms. Anthony was then told that she would no longer be working from the facility, but she would be working from home.  She was to contact only Siekert regarding her marketing efforts and was not to talk to any other staff members and to report any co-workers who attempt to contact her.

73.    Despite Ms. Anthony's repeated complaints regarding patient complaints and reports of patient harm and care deficiencies, Defendants took no adequate steps to correct the problems, nor did they undertake adequate investigation of the harm caused or deficiencies reported by Ms. Anthony.  In fact, such patient care deficiencies are continuing and on-going.

74.    Furthermore, the incidents alleged herein were not reported to the appropriate authorities as required by law and as would have been required by federal and state laws and

regulations. Moreover, when such reports were made to the appropriate agencies by patients or their family members, the Defendants actively hid grievances reports from the state agency so that the agency could not properly investigate the claims.

75.    Had such reports been made and the grievance reports made available, the state survey agency could have determined patients to be in immediate jeopardy and could have terminated the Defendants' participation in Medicare or Medicaid programs, in which case they would not have been eligible to receive any payments for the time period under which their patients were in immediate jeopardy of harm.

76.    Ms. Anthony believes that the same behavior is occurring at other Health Services Management Inc. facilities in Texas. Once a month, she would meet with her fellow marketing directors at facilities across Texas. She knows of at least five marketing directors who quit, citing the deplorable conditions at the facilities as their reason for leaving. Health Services Management Inc. and its nursing facilities, including but not limited to Huntsville Health Care Center, have defrauded the Government by billing for services never provided, denying medically necessary services to patients, and acting in such a manner that patients were receiving "worthless services." In addition, Health Services Management Inc. and its nursing facilities, including but not limited to Huntsville Health Care Center, have failed to meet state requirements relating to the reporting of grievances and incidents to the State of Texas and by not properly screening employees as required by state law and therefore have failed to meet certain conditions of payment for reimbursement of its services. As a result the Government has been damaged.

## VII. ACTIONABLE CONDUCT OF DEFENDANT UNDER THE FALSE CLAIMS ACT

77.     This is an action to recover damages and civil penalties on behalf of the United States and Ms. Anthony arising from the false or fraudulent statements, claims and acts by the defendants made in violation of the False Claims Act, 31 U.S.C. §§ 3729-3732 and the Texas Medicaid Prevention Act.

## A.     The False Claims Act

78.     For conduct occurring on or after May 20, 2009, the FCA provides that any person who:

(a)     knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(b)     knowingly makes, uses, or causes to be made or used, a false record or statement material to get a false or fraudulent claim paid (except that this language applies to all claims pending on or after June 7, 2008)

(c)     conspires to defraud the Government by committing a violation of the FCA;

(d)     knowingly makes, uses, or causes to be made or used, a false record or statement to conceal material to an obligation to pay or transmit money or property to the Government.

is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim.

79.     FCA defines "claim" as:

any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

(i)     is presented to an officer, employee, or agent of the United States; or

    (ii)    is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

        (I)    provides or has provided any portion of the money or property requested or demanded; or

        (II)    will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . .

31 U.S.C. § 3729(b)(2).

80.    The FCA allows any persons having knowledge of a false or fraudulent claim against the Government to bring an action in Federal District Court for themselves and for the United States Government and to share in any recovery as authorized by 31 U.S.C. § 3730(d).

81.    Based on these provisions, Ms. Anthony, on behalf of the United States Government, seeks through this action to recover damages and civil penalties arising from the submission of false claims by the Defendants to the United States and Medicare and the State of Texas and Texas Medicaid.  In this case, such claims were submitted to the United States and Medicare and the State of Texas and Texas Medicaid for purposes of obtaining payment for services never provided, denying medically necessary services to patients, and acting in such a manner that patients were receiving "worthless services."  Ms. Anthony believes that the United States and the State of Texas have suffered significant damages as a result of false claims for payment for services never provided, denying medically necessary services to patients, and acting in such a manner that patients were receiving "worthless services."

82.    There are no bars to recovery under 31 U.S.C. § 3730(e), and, or in the alternative, Ms. Anthony is an original source as defined therein. Ms. Anthony has direct and independent

knowledge of the information on which the allegations are based. To the extent that any allegations or transactions herein have been publicly disclosed, Ms. Anthony has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator's investigation of Defendants' fraudulent schemes and is supported by documentary evidence.

83.     As required pursuant to 31 U.S.C. § 3730(e), Relator is hereby and has voluntarily provided information, oral and/or written, and sent disclosure statement(s) describing all material evidence, and information, related to her Original Complaint, both before and contemporaneously with submission of this disclosure, to the Attorney General of the United States and the United States Attorney for the Southern District of Texas, Houston Division and to the Attorney General of the State of Texas. Contemporaneously with filing this disclosure statement, Ms. Anthony provided all material documents to the Attorney General of the United States and the United States Attorney for Southern District of Texas, Houston Division and to the Attorney General of the State of Texas. This Original Complaint is supported by documentary evidence.

**B.     Defendants Submitted or Caused to be Submitted False Claims**

84.     Ms. Anthony realleges and incorporates by reference each and every allegation contained in the paragraphs of this Original Complaint.

85.     In submitting false and/or fraudulent reimbursement claims for nursing home services performed for Medicare and Medicaid patients, Defendants knowingly presented false claims to Medicare and Texas Medicaid. Specifically, Defendants requested payment for services never provided, denying medically necessary services to patients, and acting in such a manner that patients were receiving "worthless services." The care provided to the patients as alleged herein was representative of the absence of care or inadequate care rendered to residents of Huntsville

Health Care Center and Health Management Services' other Texas facilities. The nursing care, wound care, tracheostomy care, daily monitoring, grievance reporting, and other issues alleged herein, all of which were the responsibility of the Defendants and their agents was either not rendered at all or was only rendered in contravention of the rules and regulations of Medicare and Medicaid programs, as described above, meaning the services provided were of a quality which failed to meet professionally recognized standards of health care. On each of these claims, Defendants requested false or fraudulent levels of reimbursement for services did not correspond to the actual services performed, if any were performed, or requested reimbursement for services that were not billable under the rules and regulations of the Medicare and Medicaid programs, as described above.

86.     Providers make express and/or implied certifications in their state Medicaid provider enrollment forms that they will comply with all federal and state laws applicable to Medicaid. Providers certify that they will comply with the requirements of the enrollment agreement, including federal laws and regulations relating to fraud, abuse and waste in health care and the Medicaid program. The Texas Medicaid enrollment application requires signatories to notify the State of Texas if they fall out of compliance with any of their obligations.

87.     In addition, every time they submit an electronic claim for reimbursement by the state Medicaid programs pursuant to an electronic claims submission agreement, providers also make express and/or implied certifications that they are complying with state and federal laws applicable to the Medicaid program and that there has not been a material omission. Defendants' certifications as to medical necessity and to compliance with federal and state law are false every time they bill for medically unnecessary treatment.

88.     Further, the Defendants filed cost reports with Medicare and Medicaid certifying, for instance, that services provided were in compliance with the law.  By creating and carrying out these fraudulent schemes and presenting or causing to be presented resultant claims that were false because of false certifications and on their face.

89.     Given the structure of the health care systems, false statements, representations, and records or material omissions made by the Defendants had the potential to influence the Government's payment decision.

90.     Because of the illegal acts described above, Defendants made millions of dollars in reimbursement for nursing services provided to Medicare and Medicaid patients.  The ultimate submission by Defendants of false claims to the Medicare and Medicaid programs was a foreseeable factor in the Government's loss, and a consequence of the scheme.  Consequently, the State of Texas and the United States Government have suffered substantial damages.

**C.      Defendants Made, Used, or Caused to be Made or Used False Records and/or Statements**

91.     Relator realleges and incorporates by reference each and every allegation contained in the paragraphs of this Original Complaint.

92.     Defendants knowingly made or used, or caused to be made or used, false records or statements, or omitted material facts that were material to false and/or fraudulent claims, in violation of 31 U.S.C. § 3729(a).  The false records or statements included, but were not limited to, the false or misleading bills, claim forms, and other statements provided to Medicare and Medicaid, and the false certifications, express and/or implied, and representations of full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false

reporting.  Specifically, Defendants made false records or statements in connection to services never provided, denying medically necessary services to patients, and acting in such a manner that patients were receiving "worthless services."  The care provided to the patients as alleged herein was representative of the absence of care or inadequate care rendered to residents of Huntsville Health Care Center and Health Management Services' other Texas facilities.  The nursing care, wound care, tracheostomy care, daily monitoring, grievance reporting, and other issues alleged herein, all of which were the responsibility of the Defendants and their agents, were either not rendered at all or were only rendered in contravention of the rules and regulations of Medicare and Medicaid programs, as described above, meaning the services provided were of a quality which failed to meet professionally recognized standards of health care.

93.     When submitting claims for reimbursement, providers make express and/or implied certifications on claims forms or their electronic equivalent that they will comply with the terms set out on the form.  In particular, providers certify that the services shown on the form were medically indicated and necessary for the health of the patient and were personally furnished by the healthcare provider or were furnished incident to healthcare provider's service under his or her immediate personal supervision.  Providers further certify that the information on the claims form is true, accurate and complete and that they understand that payment and satisfaction of this claim will be from Federal and Texas funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Texas or Federal laws.

94.     Providers also make express and/or implied certifications in their state Medicaid provider enrollment forms that they will comply with all federal and state laws applicable to Medicaid.  Providers certify that they will comply with the requirements of the enrollment

agreement, including federal laws and regulations relating to fraud, abuse and waste in health care and the Medicaid program. The Texas Medicaid enrollment application requires signatories to notify the State of Texas if they fall out of compliance with any of their obligations.

95. In addition, every time they submit an electronic claim for reimbursement by the state Medicaid programs pursuant to an electronic claims submission agreement, providers also make express and/or implied certifications that they are complying with state and federal laws applicable to the Medicaid program and that there has not been a material omission. Defendants' certifications as to medical necessity and to compliance with federal and state law are false every time they bill for medically unnecessary treatment.

96. Further, the Defendants filed cost reports with Medicare and Medicaid certifying, for instance, that services provided were in compliance with the law. By creating and carrying out these fraudulent schemes and presenting or causing to be presented resultant claims that were false because of false certifications and on their face.

97. Compliance with federal and state laws and regulations was a condition of payment. Each false certification or representation made in connection with a claim for reimbursement for services that were not provided or were unnecessary represents a false and/or fraudulent record or statement. Each claim for reimbursement for such services submitted to a federal health insurance program represents a false and/or fraudulent claim for payment.

98. Defendants knowingly made or used, or caused to be made or used, false records or statements, or omitted material facts that were material to false and/or fraudulent claims, in violation of 31 U.S.C. § 3729(a). These false statements or records consist of false certifications or representations made or caused to be made by Defendants to Medicare and the Texas Medicaid

43

Program when seeking to participate in these programs. Each invoice and/or claim for reimbursement for services that were not provided or were unnecessary submitted to the government health care programs represents a false and/or fraudulent claim for payment.

99. Given the structure of the health care systems at issue, given Defendants' false statements and representations, and given the false records that the Defendants made, used, or caused to be made or used, Defendants' conduct had the potential to influence government's payment decision. The Defendants' conduct also had the potential to influence the government's decisions on whether to terminate their participation in the Medicare and Medicaid programs.

100. Because of the illegal acts described above, Defendants made millions of dollars in reimbursements for procedures and services that were either not performed or unnecessary. The ultimate submission to government health plans of false claims for reimbursement was a foreseeable factor in the government's loss, and a consequence of the scheme. Consequently, the State of Texas and the United States Government have suffered substantial damages.

## VIII. CAUSES OF ACTION

### A.   Count I - False Claims (31 U.S.C. § 3729(a))

101. Relator realleges and hereby incorporates by reference each and every allegation contained in the paragraphs of this Original Complaint.

102. Defendants defrauded Medicaid by requesting and receiving payment for services never provided, denying medically necessary services to patients, and acting in such a manner that patients were receiving "worthless services." The care provided to the patients as alleged herein was representative of the absence of care or inadequate care rendered to residents of Huntsville

Health Care Center and Health Management Services' other Texas facilities. The nursing care, wound care, tracheostomy care, daily monitoring, grievance reporting, and other issues alleged herein, all of which were the responsibility of the Defendants and their agents was either not rendered at all or was only rendered in contravention of the rules and regulations of Medicare and Medicaid programs, as described above, meaning the services provided were of a quality which failed to meet professionally recognized standards of health care. On each of these claims, Defendants requested false or fraudulent levels of reimbursement for services did not correspond to the actual services performed, if any were performed, or requested reimbursement for services that were not billable under the rules and regulations of the Medicare and Medicaid programs, as described above.

103.    As a result of Defendants' violations, all of the claims for nursing home services that Defendants' submitted to Medicare and the Texas Medicaid program are false or fraudulent. Defendants knowingly submitted such false or fraudulent claims to be presented for payment or approval, in violation of 31 U.S.C. § 3729(a).

104.    The United States Government paid the false and/or fraudulent claims.

105.    By virtue of the false or fraudulent claims that Defendants knowingly submitted, the United States Government has suffered substantial monetary damages.

**B.    Count II – False Records or Statements (31 U.S.C. § 3729(a))**

106.    Relator realleges and incorporates by reference each and every allegation contained in the paragraphs of this Original Complaint.

107.    Defendants knowingly made or used, or caused to be made or used, false records or statements, or omitted material facts that were material to false and/or fraudulent claims, in

violation of 31 U.S.C. § 3729(a). These false statements or records consist of false certifications or representations made or caused to be made by Defendants to Medicare and the Texas Medicaid Program when seeking to participate in these programs. Each invoice and/or claim for reimbursement for services that were not provided or were unnecessary submitted to the government health care programs represents a false and/or fraudulent claim for payment.

108.    By virtue of the false records or statements that Defendants made or used, or caused to be made or used, the United States Government has suffered substantial monetary damages.

## RELIEF

109.    On behalf of the United States Government, Relator seeks to receive monetary damages equal to three times that suffered by the United States Government. In addition, Relator seeks to receive all civil penalties on behalf of the United States Government in accordance with the False Claims Act.

110.    Relator seeks to be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act.

111.    Relator seeks to be awarded all costs and expenses for this action, including attorneys' fees and court costs.

112.    Relator seeks to be awarded all other relief on behalf of Relator or the United States Government to which either may be entitled and that the Court deems just and proper.

## PRAYER

WHEREFORE, Relator prays that this Court enter judgment on behalf of Relator and against Defendant Senior Living Properties for the following:

a.   Damages in the amount of three (3) times the actual damages suffered by the United States Government as a result of Defendant's conduct;

b.   Civil penalties against Defendant up to $11,000 for each violation of 31 U.S.C. § 3729;

c.   Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

d.   Relator be awarded all costs and expenses of this litigation, including attorneys' fees and costs of court;

e.   All other relief on behalf of Relator or the United States Government to which either may be entitled and that the Court deems just and proper.

## C.    Count III—TEXAS MEDICAID FRAUD PREVENTION ACT

113.   Relator realleges and incorporates by reference each and every allegation contained in the paragraphs of this Original Complaint.

114.   This is a *qui tam* action brought by Relator and the State of Texas to recover double damages and civil penalties under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq.*

115.   Tex. Hum. Res. Code Ann. § 36.002 provides liability for any person who

a.   knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid Program that is not authorized or that is greater than the benefit or payment that is authorized;

b.   knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning . . . information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

c.   knowingly enters into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Medicaid program or a fiscal agent; or

47

  d.  knowingly makes, uses, or causes the making or use of a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to this state under the Medicaid program.

116. As a result of the Defendants' scheme, all claims that they have submitted to the Texas Medicaid programs are false and fraudulent. Further, Defendants falsely certified, expressed and/or implied, and represented that they were in full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting. Compliance with federal and state laws and regulations were conditions of payment.

117. The State of Texas, by and through the Texas Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

118. Given the structure of the health care systems, the false statements, representations, and/or records made by Defendants had the potential to influence the State of Texas's payment decision.

119. The ultimate submission by Defendants of false and/or fraudulent claims to the Texas Medicaid program was a foreseeable factor in the State of Texas's loss, and a consequence of the scheme.

120. As a result of Defendants' violations of Tex. Hum. Res. Code Ann. § 36.002, the State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

121. There are no bars to recovery under Tex. Hum. Res. Code Ann. § 36.113(b), Relator has fulfilled all prerequisites to suit, and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the

allegations of this Pre-Filing Disclosure Statement, who has brought this action pursuant to Tex. Hum. Res. Code Ann. § 36.101 on behalf of herself and the State of Texas.

122. This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendant:

To the STATE OF TEXAS:

(1) Two times the amount of actual damages which the State of Texas has sustained as a result of the fraudulent and illegal practices of the Defendant;

(2) A civil penalty as described in V.T.C.A. Hum. Res. Code § 36.025(a)(3) for each false claim that the Defendant presented or caused to be presented to the State of Texas;

(3) All costs incurred in bringing this action.

To RELATOR:

(1) The maximum amount allowed pursuant to V.T.C.A. Hum. Res. Code § 36.110, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

WHEREFORE, Relators respectfully request all relief described herein.

## IX.    DEMAND FOR JURY TRIAL

123.    Pursuant to Federal Rule of Civil Procedure 38, Relator demands a trial by jury.


Dated: August __10__, 2015

UNITED STATES OF AMERICA, *ex rel.* Susan Anthony



Respectfully submitted,

**Berg & Androphy**

*Rachel L. Grier*

Joel M. Androphy
Rachel L. Grier
3704 Travis
Houston, Texas 77002
Telephone: (713) 529-5622
Facsimile: (713) 529-3785
jandrophy@bafirm.com
rgrier@bafirm.com

**ATTORNEYS IN CHARGE**

**FOR RELATOR/PLAINTIFF**



### CERTIFICATE OF SERVICE

On this date, August 10, 2015, a copy of Relator's Original Complaint has been served via e-mail, FEDEX, or hand delivery on AUSAs Jill Venezia and Jennifer Lowery in the U.S. Attorney's Office for the Southern District of Texas, the Attorney General of the United States, the Department of Justice in Washington, D.C.,, and on the Attorney General's Office for the State of Texas.

*Rachel L. Grier*

Rachel L. Grier